Kevin Castel, Cahill Gordon & Reindel, New York City, for defendant.

## TECHNICAL VENTURES COMPANY, Plaintiff,

v.

## GENERAL SIGNAL CORPORATION, Defendant.

### No. 86 Civ. 1975–CLB.

United States District Court, S.D. New York.

April 22, 1987.

### MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

In this diversity action to recover upon a written finder's fee agreement, plaintiff and defendant each move for summary judgment.

There has been sufficient pre-trial discovery in this case so that there is no mystery remaining to be resolved at trial. Mr. Jack H. Krause, President of plaintiff Technical Ventures, Inc. of Marina del Rey, California, wrote a letter agreement dated September 10, 1981, addressed to Mr. C. Woodrow Rea, then Director of Corporate Development at defendant General Signal Corporation in Stamford, Connecticut. *See* Exhibit 7 in support of defendant's motion. In his letter, written following a telephone conversation of September 8th, Mr. Krause for plaintiff submitted to Mr. Rea for defendant a "Brief Summary of Karkar Electronics of San Francisco, CA that may be of interest as an acquisition candidate."

The letter described Karkar briefly as a manufacturer of electronic equipment, founded and controlled by Edward Karkar. The letter, after reporting that Mr. Karkar was feeling "the strain of managing and financing this rapid growth and feels that the future of his company belongs in stronger corporate hands," suggested that Karkar was "willing to consider acquisition with a large company that has solid resources and a sincere interest in the microwave communications field." The letter continued as follows:

"If you feel you could be interested I'll bring your potential interest to his [Karkar's] attention, supply further information, and arrange a meeting if desired.

In this situation, GENERAL SIGNAL will be responsible for the finder's fee, which is based on the standard Lehman formula of [declining percentages of the purchase price]. The fee will be due and payable at the closing of this transaction.

Please indicate your acceptance of these terms by signing the enclosed copy of this letter and returning it to me.

Thank you."

Mr. Rea did sign the letter for General Signal and returned it to plaintiff under date of September 15, 1981. Rea thereafter referred all information on Karkar to Stephen E. Speltz, then President of defendant's Warren/Dielectric unit, whose product was similar to that of Karkar.

While it is of no more than passing interest, Rea left the position of the Director of Corporate Development of defendant in November 1981, and was not replaced until March of 1982. Neither the individual to whom Rea reported, J. Robert Hipps, nor Rea's replacement, Michael Jacqmin, testified to the recollection of any communication with Krause concerning Karkar, nor did Krause communicate with them on the subject. Hipps left General Signal in 1983. It may be inferred, although the Court regards the fact as of no more than marginal relevance, that nobody at General Signal knew of the retainer agreement, Exhibit 7, after Speltz left the company in August of 1982. Mr. Karkar was not sued.

Uncontroverted evidence obtained in pretrial discovery indicates that Krause was told by Speltz, in behalf of defendant in December 1981 that there was "not a high level of interest" in Karkar, and thereafter never pursued the acquisition efforts further, and that Speltz and Rea, the individuals dealing with this acquisition for defendant in 1981, never met with Krause, or anyone associated with Karkar. It is undisputed that in June 1982, Edward Karkar told Krause that he was taking the company off the market for the time being, although Krause did not believe that Karkar had in fact taken his company off the market, and Krause did not so inform General Signal.

As the reader may now have anticipated, plaintiff was unable in 1982 and 1983 to sell Karkar Electronics to General Signal at an asking price of $25 Million Dollars in cash or stock. But in June 1984, Wertheim & Co., an entirely unrelated finder, identified Karkar to Michael Jacqmin as a potential acquisition for General Signal. The asking price in June 1984 was between $150 and $175 Million Dollars, and Karkar Electronics was ultimately acquired in August 1985 for approximately $100 Million Dollars, four times more money. Although Mr. Karkar (not sued here) undoubtedly knew of plaintiff's prior efforts to sell his company to General Signal, nobody acting for General Signal in 1984 in the matter had any knowledge of the prior activities of Woodrow Rea with Krause concerning Karkar. It is absolutely clear that plaintiff was not the procuring cause of the 1984 transaction, and that Wertheim was the finder, paid as such.

California law, which probably regulates this transaction, requires that a finder must be the "procuring cause" of the transaction in order to earn a finder's fee. A procuring cause is the "cause originating a series of events that, without break in their continuity, result in the accomplishment of the prime object of the employment." *Pass v. Industrial Asphalt, Inc.,* 239 Cal.App.2d 776, 49 Cal.Rptr. 190, 195 (Dist.Ct.App.1966).

Plaintiff in this action, recognizing that he could not prove that he was the procuring cause of the ultimate purchase in 1984, has pointed out quite correctly that where there is a written agreement regulating the obligations of the finder, the written agreement will control over the case law applicable when the relationship arises merely by operation of law. The difficulty with this argument is that this Court believes that the September 10, 1981 retainer agreement, signed by General Signal, but drafted by Jack H. Krause, as President of Technical Ventures Co., must be construed against the draftsman as to

 

any ambiguity. Fairly read, this agreement contemplates that Krause through Technical Ventures Co. had undertaken, for a contingent compensation, to become the procuring cause of a purchase of Karkar Electronics by General Signal Corporation. The entire letter is consistent with a promise to bring about a closing within a reasonable time, with no fee to be payable, except following a closing of the transaction. By no stretch of the imagination can this document be read to constitute a promise to pay at some indefinite future time a commission on the acquisition of Karkar produced by another finder.

■ In this case apparently no meeting was ever arranged, and Karkar had said, unequivocally (although not believed by Krause), that he had taken the company off the market. Whatever early sales effort plaintiff had made with Woodrow Rea was lost, and it is clear as a matter of uncontroverted fact that the principals of General Signal Corporation, in acting on the later acquisition presented to them by Wertheim, were not motivated in any way whatsoever to purchase Karkar by any of plaintiff's prior dealings in the matter. Karkar is not a party to this litigation, and there is no indication that plaintiff's services, such as they were, rendered to the defendant sued here, conferred any benefit upon the defendant, to support a claim of quantum meruit.

In *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), the Supreme Court likened the standard for Rule 56 summary judgment to the standard for directing a verdict: "Whether the evidence presents a sufficient disagreement to require the submission to a jury or whether it is so one sided that one party must prevail as a matter of law." Since all of the evidence in this case has been developed in pre-trial discovery, and that evidence, if presented to the Court at trial must result in a directed verdict in favor of defendant, there is no reason why defendant's motion for summary judgment should not be, and it hereby is, granted.

The Clerk shall enter final judgment. So Ordered.